1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   DAVID R. CALLAWAY (CABN 121782)
3  Chief, Criminal Division

4  SUSAN E. BADGER (CABN 124365)
   Assistant United States Attorney
5
        450 Golden Gate Avenue, Box 36055
6       San Francisco, California 94102-3495
        Telephone: (415) 436-7199
7       Fax: (415) 436-7234
        E-mail: Susan.Badger@usdoj.gov
8
   Attorneys for United States of America
9

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                     SAN FRANCISCO DIVISION

13
   UNITED STATES OF AMERICA,          )   No.:  CR 14 0270 EMC
14                                     )
              Plaintiff,               )   UNITED STATES' SENTENCING
15                                     )   MEMORANDUM
        v.                            )
16                                     )   Date:   May 20, 2015
   KEVIN KOFF,                         )   Time:   2:30 p.m.
17                                     )   Court:  Hon. Edward M. Chen
              Defendant.               )
18   _____)

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2   INTRODUCTION ...................................................................................................................1

3   DISCUSSION .......................................................................................................................1

4          A.      Offense Conduct ...........................................................................................1

5          B.      Relevant Conduct..........................................................................................5

6          C.      Victim Impact Statements.............................................................................6

7          D.      Sentencing Guideline Range .........................................................................6

8          E.      Government's Sentencing Recommendation.................................................6

9                  1.      The Seriousness of the Offense..........................................................7

10                 2.      Nature and Circumstances of the Offense / History and Characteristics...............13

11                 3.      Supervised Release .........................................................................17

12                 4.      Restitution .......................................................................................17

13  CONCLUSION....................................................................................................................29

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## FEDERAL CASES

*New York v. Ferber*, 458 U.S. 747 (1982) ............................................................................ 7

*Paroline v. United States*, ___ U.S. ___, 134 S.Ct. 1710 (2014)....................................... passim

## FEDERAL STATUTES

18 U.S.C. § 2252(a)(4)(B) .................................................................................................... 1

18 U.S.C. § 2253(a)(1) ......................................................................................................... 1

18 U.S.C. § 2259(a) ............................................................................................................ 18

18 U.S.C. § 2259(b)(1) ................................................................................................... 18, 24

18 U.S.C. § 2259(b)(3) ....................................................................................................... 18

18 U.S.C. § 3771(a) ........................................................................................................... 13

1

## **INTRODUCTION**

2          On January 14, 2015, defendant Kevin Koff entered a guilty plea to one count of possession of

3    child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B), as charged in the single count of the

4    indictment in the above-captioned case.  Koff entered his guilty plea as an open plea; there is no plea

5    agreement between the government and Koff.

6          The indictment also contains a criminal forfeiture allegation, pursuant to 18 U.S.C. § 2253(a)(1)

7    and (a)(3), notifying the defendant that upon conviction of the child pornography possession charge, he

8    shall forfeit the property listed therein, that is, five computers that were seized pursuant to a search

9    warrant executed at Koff's residence on October 9, 2013.  At the January 14 change of plea hearing,

10   Koff consented to the forfeiture of the computers listed in the forfeiture allegation.  On April 21, 2015,

11   the Court entered a Preliminary Order of Forfeiture for the items listed in the indictment.  *See*, Docket

12   Document 46.  The Court stated that the Preliminary Order would become final at the time of sentencing

13   and would be made part of the sentence and included in the judgment.  *Id*.

14         Sentencing is scheduled to take place before this Court on May 20, 2015 at 2:30 p.m.  The

15   government submits its sentencing memorandum in order to discuss the offense conduct, advise the

16   Court of its calculation of the applicable sentencing guideline range, and advise the Court of its

17   sentencing recommendation.  The latter includes a recommendation that the Court impose an order of

18   restitution.  In conjunction with that request, the government has separately submitted victim impact

19   statements by victims who have expressly requested restitution in this case.[1]

20

## **DISCUSSION**

21   **A.      Offense Conduct**

22         The Presentence Report accurately describes the offense conduct.  Department of Homeland

23   Security, Homeland Security Investigations (HSI) Special Agent Brian Ginn initiated this investigation

24   as part of an ongoing effort to proactively combat the distribution of child pornography through peer-to-

25   peer file sharing software, to include sharing of child pornography through the BitTorrent network.  The

26   BitTorrent network is a popular and publicly available peer-to-peer file sharing network.  Computers

27

28   _____

     [1] The victim impact statements are filed under seal as Government's Exhibits 2-17 In Support of
     Sentencing Memorandum.

UNITED STATES' SENTENCING MEMORANDUM
CR 14-0270 EMC                                    1

1  that are part of a BitTorrent network can simultaneously provide files to other computers that are part of

2  the network while downloading files from other computers.

3    The BitTorrent network can be accessed by peer/client computers through network programs

4  such as one called uTorrent.  These client programs can be downloaded from the internet.  During

5  installation of the network client program, various settings are established which configure the host

6  computer to share files through automatic download.  The license agreement that appears during the

7  installation process explains the automatic downloading process to the user.  Typically, as users

8  download files or pieces of files from other peers/clients on the BitTorrent network, other users on the

9  network are also able to download the files or pieces, thereby taking advantage of a process that

10  maximizes download speeds for all users on the network.

11    As part of SA Ginn's ongoing investigation, he utilized a law enforcement BitTorrent network

12  client program on an undercover computer connected to the internet and determined that files containing

13  child pornography were available for downloading from a computer at an IP address that was ultimately

14  associated with the address in San Francisco where Kevin Koff was residing.  On a number of occasions

15  from June 2013 through September 2013, SA Ginn downloaded child pornography videos via the

16  BitTorrent network from the computer using the subject IP address subscribed to at Koff's residence.

17  In the course of the four-month investigation, 36 separate video files containing images of minors – in

18  some cases, pre-pubescent minors – engaging in sexually explicit conduct were downloaded from the

19  computer at the subject IP address.  SA Ginn provided the data to the National Center for Missing and

20  Exploited Children (NCMEC) for a determination whether any of the files depicted child victims who

21  have been identified by law enforcement.  NCMEC reported that fourteen of the files depicted the victim

22  known as "Jenny."  The videos in that series were made in the state of Michigan when the victim was

23  eight and nine years old.

24    SA Ginn conducted further investigation of the subject IP address and learned through Comcast

25  Cable that it was associated with a high speed internet service account in the name of Len Griffin at

26  1311 40th Avenue, Apartment 4, San Francisco.  Further investigation associated Suzanne Koff, age 82,

27  and Kevin Koff, age 45, with the 40th Avenue address.

28    Based on evidence obtained in the investigation, SA Ginn obtained a search warrant for the 40th

UNITED STATES' SENTENCING MEMORANDUM
CR 14-0270 EMC       2

Avenue apartment and executed the warrant on October 9, 2013.  The warrant was executed at 6:00 a.m. and Koff answered the door nude.  The apartment was in a state of extreme dishevelment, clutter, and filth.  It appeared that Koff was the only occupant of the apartment; however, during the search, agents located bills from Comcast and AT&T in the name of Len Griffin at the apartment.  Subsequent investigation led to the Len Griffin in whose name the accounts were held.  HSI agents interviewed Griffin at his home in Maryland on December 3, 2013.  Griffin said that he has never lived in San Francisco and did not know Kevin Koff.  Griffin advised that he was the victim of identity theft approximately three years earlier.

When agents searched Koff's apartment, they found a Dell Inspiron desktop computer located on a desk in the living room.  The computer was running and the internet browser was open to a website called investing.com.  The agents let Koff get dressed and advised him of the search warrant, which related to child pornography, and provided him with a copy.  Koff made several spontaneous, unsolicited statements to include, "I never sent anything in my life," "I never hurt anyone," "I don't hurt people," "I'm just the way I am," "I'm a sad person," "I've never touched anyone illegally," "I assure you I'm no threat to anyone," "I'm by myself," and "I've never taken a picture."

The agents told Koff that he was not under arrest at that time, but they nevertheless gave Koff the *Miranda* warnings and asked if he would consent to an interview.  He said that he did not want to be interviewed and agents permitted him to remain in the apartment while the warrant was executed.

The computer forensic agent conducted a preview of the Dell Inspiron computer and saw that the profile name listed at the top of the browser window was "Kevin Koff."  Multiple tabs were also open in the internet browser, including www.Nakido.com.  It showed that the download of two child pornography files was complete and a box could be clicked which read, "Save."

The Windows Explorer window was open with the search term "raygold" typed in.  The desktop screen showed two shortcuts for the BitTorrent Client Program, uTorrent.  The forensic agent navigated to a folder entitled "uTorrent."  A number of the titles in the folder were consistent with titles indicating child pornography content.  Using forensic software to conduct a preliminary examination of some of the content on the computer, SA Ginn located three child pornography videos that had been downloaded from the computer at the subject IP address during the course of his investigation.

UNITED STATES' SENTENCING MEMORANDUM
CR 14-0270 EMC                                      3

A dry erase board covered in writing was next to the desk.  Some of the writing appeared to pertain to investing.  Other terms, such as "PTHC RAYGOLD VIDEOS," which pertained to child pornography, were also written on the board.  PTCH is a well-established acronym for "Pre-Teen Hardcore."

In addition to the Dell Inspiron desktop and the dry erase board, agents seized four additional desktop computers from a closet.

During the early stages of the search, Koff made a comment that he might kill himself when this was all over.  The agent who overheard this asked Koff if he was serious, and Koff responded that he was kidding.  When the execution of the search warrant was complete, SFPD arrested Koff, in part out of concern for his welfare and to have him undergo a psychological evaluation.  The local charges were subsequently dropped with the understanding that federal charges would likely be filed.

Forensic examination of the five seized computers located videos and images of child pornography on the images of the hard drives of each computer.  Further review of the Dell Inspiron located the 36 video files that SA Ginn downloaded via the BitTorrent network over the course of the investigation.

Both the Dell Inspiron and the Dell CPU Vostro computers contained uTorrent folders and evidence that the BitTorrent network had been used to download child pornography.  In examining the contents of the Dell Inspiron, SA Ginn noted that snippets of titles of some of the child pornography images and videos were written on the dry erase board next to the computer.  The names of the files on the computers containing the child pornography images and videos were consistent with naming conventions for child pornography.  That is, they conveyed the age of the child and type of activity depicted, such as "Amber 7 YO [years old] Oral and Anal with Dad.wmv," and "raygold.-.underage.-.lil.girls.torrent."  Many of the images and videos involved young children being penetrated by adult males.  Four of the five computers contained indicia associating Kevin Koff with the computer, e.g. e-mails, documents, letters.

A total of 821 child pornography videos and 7,645 child pornography images were located on the five computers found in Koff's residence.  The Dell Inspiron computer that was operating when the

search warrant was executed contained 261 child pornography videos and 196 child pornography images. The uTorrent file was created in June 2011. The computers found in the closet were as follows:

- The Dell Vostro computer contained 14 child pornography videos and 2355 child pornography images. The uTorrent file was created in January 2008, and the child pornography download dates ranged from November 2007 through November 2011.

- The Dell MCT2 computer contained 365 child pornography videos and 4113 child pornography images. The download dates ranged from May 2001 through June 2007.

- The Actnet computer contained 169 child pornography videos and 818 images. They were downloaded from May 2000 through December 2002.

- The 44Max computer contained 12 child pornography videos and 163 child pornography images which were downloaded from January 2000 through May 2000.

Examination of the computers revealed no e-mails or other type of evidence of Koff engaging in conversations with others about exchanging child pornography. While Koff's long-time use of the BitTorrent network suggests that he would have known that others were downloading child pornography through his use of the peer-to-peer file-sharing network, there was no explicit evidence establishing that fact. Koff did not submit to an interview; therefore, he was never questioned about knowing distribution. Accordingly, in the government's view, there was insufficient evidence to establish beyond a reasonable doubt that Koff knowingly and intentionally distributed child pornography.

### B.   <u>Relevant Conduct</u>

For various reasons, including the time it took to complete the forensic examination of the computers, the grand jury did not issue its indictment in this case until May 15, 2014. When SA Ginn went to the 40th Avenue apartment to arrest Koff, he learned from the property manager that Koff had moved, without notice, sometime in early 2015. Koff provided no forwarding address or contact information to the property manager. Investigation by SA Ginn revealed that Koff possessed a Nevada driver's license and a vehicle was registered in his name in Nevada. On February 27, 2014, Koff's Nevada driver's license records were updated to reflect a mailing address at a PO Box in Carson City, Nevada and a physical address in Elko, Nevada. The car registration records were also updated to show the Elko address. Research revealed that the Elko address was a "Goin' Postal" store that offered

private and U.S. Postal Service mailboxes.  Additional investigation focused on another address

associated in Koff in Stateline, Nevada.  Efforts to locate Koff at that address were fruitless.

On May 22, 2014, the vehicle registered to Koff was spotted parked near an apartment

complex in Carson City,  Nevada.  HSI agents took Koff into custody without incident that same day.

During the execution of the arrest warrant, Koff consented to the search and seizure of his laptop

computer.  A forensic examination of the computer, which is described more fully in section E(2),

below, determined the presence of child pornography.

### C. Victim Impact Statements

The child pornography images and videos recovered from the five computers seized at Koff's

residence on October 9, 2013 were submitted to NCMEC for analysis.  Seventy-one known victims were

identified in the images and videos.  Victim impact statements have been received from fourteen of

those individuals and/or the victim's parent or guardian.  The statements have been provided to the

defendant and the Probation Officer, and are filed under seal in a separate filing.  *See*, United States'

Exhibits 2-17 in Support of Sentencing Memorandum, filed separately under seal, include Victim

Impact Statements from the victims in the following series:  Angela, Vicky, Cindy, Jan-Feb (L.S.),

Marineland (Sarah), Tara, Misty, Leopard Tights, Jenny, Jessica, Hawaiian Purple, Ballet Girl (B.A.),

Ballet Girl (B.H.), 8 Kids (John Doe IV).

### D. Sentencing Guideline Range

The Probation Officer has determined that the Adjusted Base Offense Level, before any

adjustment for acceptance of responsibility, is level 31.  *See*, PSR, ¶¶ 29-37.  The Probation Officer

granted the three-level reduction for acceptance of responsibility, bringing the Total Offense Level to

level 28.  *Id*. at ¶¶ 39-41.  The Probation Officer further determined that Koff falls within Criminal

History Category 1, thereby resulting in a sentencing guideline range of 78 to 97 months.  *Id*., ¶¶ 46, 80.

The government concurs with these calculations.

### E. Government's Sentencing Recommendation

The government recommends that the Court impose a sentence at the low end of the applicable

1    sentencing guideline range, that is, a sentence of 78 months.  This recommendation is largely driven by a

2    number of aggravating factors present in this case, including the volume of Koff's collection of child

3    pornography, the fact that he appears to have been engaging in the collecting and possession of child

4    pornography for many years, and the fact that he apparently continued to engage in viewing child

5    pornography even after authorities searched his residence and seized his computers.  A primary concern

6    here is imposing a sentence that not only reflects the seriousness of the offense, promotes respect for the

7    law, and provides just punishment for the offense, but which also protects the public from Koff.  Each of

8    these factors is a required consideration under Section 3553(a).  A 78-month sentence is sufficient, but

9    not greater than necessary, to fulfill those sentencing requirements.

10        Of particular concern in this case is the seriousness of the offense, the nature of Koff's conduct,

11   and Koff's characteristics.  The government addresses each below.

12                          *1.    The Seriousness of the Offense*

13        The relatively high sentencing guidelines for the child pornography offense committed by Koff

14   reflect society's growing recognition of the seriousness of the offense and the harm suffered by its

15   victims.  As the Supreme Court recognized recently in its opinion in *Paroline v. United States*, ___ U.S.

16   ___, 134 S.Ct. 1710 (2014), the crime of possession of child pornography is not a victimless crime.  The

17   Court noted that the harms caused by child pornography are not limited to the abuse that takes place

18   when the images are created.  "The harms caused by child pornography, however, are still more

19   extensive because child pornography is 'a permanent record' of the depicted child's abuse, and 'the

20   harm to the child is exacerbated by [its] circulation.'"  *Id.* at 1716-17, *quoting, New York v. Ferber*, 458

21   U.S. 747, 759 (1982).  The Court stated, "[b]ecause child pornography is now traded with ease on the

22   Internet, 'the number of still images and videos memorializing the sexual assault and other sexual

23   exploitation of children, many very young in age, has grown exponentially.'"  *Id. quoting,* United States

24   Sentencing Comm'n, P. Saris et al., Federal Child Pornography Offenses 3 (2012).

25        As illustration of the "devastating harm caused by child pornography," the Supreme Court

26   quoted from the impact statement of one of the individuals whose images the respondent possessed, and

27   in which the victim described the trauma of knowing that the photographs that were taken of her by her

28   uncle when she was eight and nine years old are being circulated and viewed endlessly.  *Paroline*, *supra*,

UNITED STATES' SENTENCING MEMORANDUM
CR 14-0270 EMC                           7

1   134 S.Ct. at 1716-17.  The victim explained that she felt "powerless to stop it just like I was powerless

2   to stop my uncle … My life and my feelings are worse now because the crime has never really stopped

3   and will never really stop…. It's like I am being abused over and over and over again." *Id.* at 1717.

4        The Court stated, "[t]he full extent of this victim's suffering is hard to grasp." *Paroline, supra*,

5   at 134 S.Ct. at 1717.  It noted that her abuser "took away her childhood, her self-conception of her

6   innocence, and her freedom from the kind of nightmares and memories that others will never know." *Id.*

7   The Court went on to say that "[t]hese crimes were compounded by the distribution of the images of her

8   abuser's horrific acts, which meant the wrongs inflicted upon her were in effect repeated; for she knew

9   her humiliation and hurt were and would be renewed into the future as an ever-increasing number of

10   wrongdoers witnessed the crimes committed against her." *Id.*

11        In *Paroline*, the Court was deciding whether a defendant who possessed two pornographic

12   images of a child victim is liable for restitution to that victim years later for all or part of the financial

13   losses the victim incurred for expenses such as counseling and lost income as a result of the trauma

14   experienced from the continual dissemination of her images to thousands of individuals such as the

15   defendant.  *Paroline, supra*, 134 S.Ct. at 1716-18.  The Court found that liability for restitution was

16   appropriate under these circumstances, holding that "[t]he cause of the victim's general losses is the

17   trade of her images.  And Paroline is part of that cause, for he is one of those who viewed her images."

18   *Id*. at 1726.  "While it is not possible to identify a discrete, readily definable incremental loss he caused,

19   it is indisputable that he was part of the overall phenomenon that caused her general losses." *Id.*

20        The Supreme Court's comments in *Paroline* are relevant to the issue of restitution, as discussed

21   in Section 4, below.  However, the government emphasizes the Court's comments in this section of its

22   sentencing memo because the Court's assessment of the nature and magnitude of the harm caused by the

23   "mere" obtaining and possession of child pornography demonstrates the seriousness of the offense, one

24   of the factors that the sentencing court is to take into consideration under § 3553(a).  In *Paroline*, the

25   highest court unequivocally recognized the real harm to real human beings that results from the conduct

26   in which Koff and millions of others have engaged, and found the link between possessing child

27   pornography and that harm sufficient to require a possessor to pay restitution to the individuals depicted

28   in those images.  The relatively high guideline range imposed by the Sentencing Guidelines and which

1    Koff now faces is consistent with the Supreme Court's characterization of Koff's offense as causing

2    devastating harm.

3       The statements by the victims in the *Paroline* case, as cited by the Supreme Court, are sadly

4    echoed in the impact statements received from individuals whose images Koff possessed.  Tthe victims

5    and/or their parent, guardian, and/or evaluating psychologis discuss the pain, harm, and psychological

6    consequences of the victim knowing that images of his or her abuse and humiliation are continually

7    acquired and exchanged via the internet by those who gain gratification from viewing those images of

8    abuse.

9       For instance, the enduring and pervasive harmful ramifications of not only the original sexual

10   abuse of a child, but the dissemination and viewing of that abuse by strangers, are described in the report

11   of Dr. Alexandria Doyle, included in Exhibit 3 of the United States' Exhibits in Support of Sentencing

12   Memorandum.  In early 2014, Dr. Doyle interviewed the now 13-year old girl who was depicted in the

13   series of pornographic images and videos known as "the Angela series."  Forensic examination of Koff's

14   computer showed that he possessed twelve images in the series.  The images depicted the sexual abuse

15   of the victim, referred to here as Angela, by her biological father during ages four through six.  Although

16   she was only twelve years old when she was evaluated by Dr. Doyle, Angela was diagnosed as suffering

17   from Posttraumatic Stress Disorder, Major Depressive Disorder, and Unspecified Attention Deficit

18   Disorder. *See*, Exh. 3, Doyle Report, at p. 5.  Dr. Doyle found that Angela had significant problems

19   regulating anxiety, controlling her emotions, trusting people, and dealing with social situations. *Id.* at 4.

20   She had difficulty tolerating closeness with others, difficulty concentrating, and a significant fear of

21   being subjected to aggression by others. *Id.*  Angela reported to Dr. Doyle that knowing that other men

22   having her pictures creates distress for both herself and her mother because it reminds her of being

23   abused and exploited. *Id.*  Dr. Doyle writes that Angela "feels saddened that she is the object of other's

24   perversions and worries about the risk it poses to her.  This contributes to the feeling that additional

25   trauma could face her." *Id.*  Dr. Doyle concludes that "the sexual abuse of [victim's true name] brought

26   a level of fear and discomfort to her that is difficult for her to manage and over which she has little

27   control.  This has forever distorted her view of the world and her position in that world.  With aggressive

28   treatment her prognosis is fair to guarded." *Id.* at 7.

1    Another victim, who is now a young adult, is the person depicted in the photographs described as

2    the "Vicky series."  Forensic review of Koff's computers shows that he possessed eleven images and

3    twenty videos in the Vicky series.  This young woman's victim impact statement, a statement by her

4    mother, original and updated reports of the forensic psychological evaluation by Dr. Randall Green,

5    vocational assessments, and other documentation are filed separately with the Government's Exhibits at

6    Exhibit 4.

7    The victim describes the trauma that has followed the original abuse once she came to

8    understand that images of the sexual abuse that she suffered are being circulated endlessly on the

9    internet:

10   "I live everyday with the horrible knowledge that many people somewhere are watching the
        most terrifying moments of my life and taking grotesque pleasure in them.  I am a victim of
11      the worst kind of exploitation:  child porn.  Unlike other forms of exploitation, this one is
        never ending.  Everyday, people are trading and sharing videos of me as a little girl being
12      raped in the most sadistic ways.  They don't know me, but they have seen every part of me.
        They are being entertained by my shame and pain. … My world came crashing down
13      the day I learned that pictures of me being sexually abused had been circulated on the
        internet.  Since then, little has changed except my understanding that the distribution
14      of these pictures grows bigger and bigger by the day and there is nothing I can do about it.
        The enormity of this has added to my grief and pain, and given me a paranoia.  I wonder if
15      the people I know have seen these images.  I wonder if the men I pass in the grocery store
        have seen them.  I feel totally out of control.  They are trading around my trauma like
16      treats at a party and it feels like I am being raped all over again by every one of them.  …
        I can never feel safe so long as my images are out there; every time they are downloaded, I am
17      exploited again, my privacy is breached, and I feel in danger again.  I fear that any of them may
        try to find me and do something to me."
18

19

20   Exhibit 4, at Item 1, Updated Victim Impact Statement from "Vicky" Series Victim – December 2011,

21   (Item #1,) at p. 1.[2]

22   Vicky goes on to state that she has been justified in her paranoia.  She states that some people

23   who have viewed her images have tried to contact her, including sending e-mails in which they

24   suggested making pornographic videos.  One has stalked her and another has created a slideshow of

25   Vicky on YouTube. *Id*., at pp. 1-2.  Vicky's counsel advises that her client has been contacted by

26

27       [2] Counsel for Vicky advises that "Vicky and her family ask that their impact statements and her
     letter to the judge be read aloud at the time of sentencing."  *See*, Letter of Carol S. Hepburn, Esq., Exh.
28   4, at p. 3.  Undersigned government counsel respectfully requests leave to read these statements at
     Koff's sentencing.

multiple individuals seeking to communicate with her about the images of her abuse.  In the materials

provided to the government, Vicky's counsel included screenshots of internet discussions about trying to

locate the young woman depicted in the Vicky series and chats that include purported photographs of the

young woman.  Exh. 4, at Item #9.

Vicky's mother echoes the pain described by Vicky.  Her mother states that her daughter was

raped and sexually abused in many ways by her biological father when Vicky was ten years old.  Her

father videotaped the abuse and then shared the videos and images on the internet.  Vicky's mother

states:

> "Knowing that these disturbing videos of [my daughter] and her abuser are being viewed,
> and are continuing to foster this corrupt sexual behavior, bring a lot of pain, stress, and
> shame to her.  At the cost of her dignity, modesty, and innocence, people viewing those
> images of her are furthering the terrible addiction of child pornography for themselves
> and others they pass it on to.  Those images are not who my daughter is, or ever wanted
> to be, but because she was robbed of her innocence, forced to do ugly things, and it was
> videotaped, she is continually being viewed as someone she is not.  She is in fact the
> opposite.  These offenders are still victimizing and torturing her, bringing pain and shame
> every time they look at those images of her.  As her mother, I share in this heartbreaking
> pain and the sadness this brings to me is unending.  **These viewers need to understand that
> there is a helpless little girl on the other side of these videos, whose innocence and
> childhood were shattered and viewing these things make them a part of the abuse, and
> unimaginable pain my daughter, and our family have to face all the time.  Making, viewing,
> and down-loading child pornography is wrong and a crime.  I hope everyone can know
> that child pornography is not a victimless crime by the statement I've shared with you
> about my daughter, and our family's constant pain and struggle.**"

Exh. 4, Item #2, at p. 1 (emphasis added).

"Sarah," the victim in the "Marineland" series, was abused over a six to seven year period by her

biological father when Sarah was five to eleven years old and her father had sole custody of her.  The

victim impact materials for Sarah are contained in Exhibit 6.  Sarah is now a young adult who writes as

follows:

> "I am writing to tell you what it is like for me to know that pictures of what my father
> did to me are on the internet.  I am told that there is a known group of my pictures that is
> labeled the "Marineland" series.  My natural father molested me when I was a child.
> First, he woke me up at 3-5:00 in the morning on school nights to take pictures.
> First the pictures were of me with my clothes on, then he made me take my clothes off
> for the pictures.  Then he made me look at pictures of other people – men and little girls –
> who had their clothes off.  He said it would give me ideas.  As things progressed he
> started molesting me and taking pictures of me with his own body parts and sometimes
> with a vibrator.  He took many pictures and I know now that he sent those pictures to his

'friends' and many other people on the Internet.

My father is now in jail and will be for a long time.  And I am not a child anymore.  But I worry that the people he sent my pictures to will come after me and try to do the same things to me again.  I worry that the pictures of me and what he did have been passed on and on and on to many other pedophiles and any one of them or more could be in my neighborhood or at the store I go to or anywhere around me.  I don't go out of my house unless I have a friend with me I really trust.

I am afraid that someone from the police will call and tell me that they found more pictures on other people's computers.  Every time someone else sees pictures or videos of me it feels like they are the ones who hurt me to begin with.  It feels like they are the ones who did this to me, like they are my father and they just want to use me for their own pleasure.  It is like I am just here for other people's pleasure and am not a person myself with my own wants and needs.  If you are looking at pictures or videos of me, or any other child for that matter, then you are hurting everyone that you look at.  **Anyone who looks at those horrible pictures of me or other children are abusing us.  Anyone who looks is keeping my pain going for the rest of my life.  I cry at night because of this. Even though I don't know the names of all of them, I know that they are out there and I am afraid that they are all around me.  My fear keeps me from doing things that other girls my age could normally do, like going to school or have a job or be social with more than just the very small number of people that I really trust."**

Exh. 5, Item 1, p. 1 (Victim Impact Statement)(emphasis added).[3]

The mother of "L.S.," the victim in the "Jan-Feb" series, says that her daughter was repeatedly abused in order to produce images for the purpose of being traded/shared over the internet.[4]  "Without a market to receive and trade those images, without the encouragement of those who wanted to acquire the images, I truly believe this abuse would not have occurred.  All those who trade these images and thereby create the demand for lurid and violent depictions of children are participants in the exploitation of my daughter. … My daughter was exploited, not only by one individual, but also by an industry that consumes and destroys innocent children."  *See*, Exh. 6, Letter dated 8/26/08, "To Whom it May Concern," at page 2.  L.S.'s mother goes on to recount the effects that the abuse has had on her daughter: "I've watched my daughter transformed from a buoyant, cheerful child full of energy and enthusiasm, to an anxious and fretful shadow of her former self.  And I've watched the painful struggle as she's worked to overcome the damage done, and build a new life for herself."  *Id*. at 2.

---

[3] The forensic review of Koff's computers showed that he possessed one video of Sarah.

[4] The forensic review of Koff's computers revealed six images of L.S.

1    When L.S.'s mother wrote her statement, L.S. was still young and was not fully aware of the

2    extent to which the images of her were being disseminated.  The mother dreaded that dawning

3    realization.  *Id.* at 3.  She stated:  "I can find no words to express the fury I feel at those who participate

4    in this evil, or my scorn for any attempt to minimize the responsibility by feeble claims that the crime is

5    "victim-less."  My daughter is a real person.  She was horribly victimized to provide this source of

6    "entertainment.  She is exploited anew each and every time an image of her suffering is copies, traded or

7    sold.  While the crime is clearly conscienceless, it is hardly "victim-less."  *Id*. at 5.  L.S.'s mother

8    concludes:  "As the mother of a child victimized by this crime, I would ask that the court take into

9    consideration the damage done by this heartless crime to my daughter and others like her (including

10   those children who still wait for someone to rescue them from their exploitation, and have no-one here

11   today to speak for them) and impose a sentence that takes into account the full impact of the crime on

12   the victims."  *Id*.

13   The ten other individuals whose images were found in Koff's collection and who submitted

14   victim impact statements consistently describe the same feelings of powerlessness, pain, and humiliation

15   that accompany the pervasive feeling that the original abuse is being repeated each time the images are

16   viewed.  *See*, Exhs. 7 through 16.  Due to space limitations, the government does not quote each here.

17   Nevertheless, each of these individuals has a right under the Crime Victims' Rights Act (CVRA) at 18

18   U.S.C. § 3771(a) to be reasonably heard at Koff's sentencing proceeding.  The government has provided

19   each victim's statement and respectfully requests that the Court consider each statement in evaluating

20   the seriousness of the offense under § 3553(a).

21   As the Supreme Court found in *Paroline*, and as the victim impact statements in this case

22   eloquently describe, the crime committed by Koff is unquestionably serious.

23               **2.    *Nature and Circumstances of the Offense / History and Characteristics***
24               ***Of the Defendant***

25   As described above, when agents executed the search warrant at Koff's residence on October 9,

26   2013, they found Koff living alone in a setting that was cluttered and filthy.  At 6:00 in the morning,

27   Koff had his computer running and was in the process of downloading child pornography.  The Dell

28   Inspiron desktop computer had an active uTorrent program installed and the computer contained the 36

1  child pornography video files that SA Ginn had downloaded via the Bit Torrent peer-to-peer network

2  from Koff's computer during the course of the investigation.  It also contained 261 child pornography

3  videos and 196 child pornography images; the uTorrent file was created two years earlier.  Koff had four

4  other computers in a closet; they contained an additional 560 child pornography videos and 7,449 child

5  pornography images.  The download dates for child pornography on these four computers went back to

6  January 2000.  Based on comparisons with other child pornography cases prosecuted in this district, this

7  is a particularly large collection.  Moreover, collecting child pornography off the internet was not a new

8  activity for Koff.  He had been engaged in it for more than thirteen years.  In light of the statements by

9  the Supreme Court and the victims in this case about the trauma and harm caused by the constant

10  circulation of images of the original sexual abuse, the harm that Koff was perpetrating for years is

11  significant.

12      Even though Koff sat through the execution of the warrant, witnessed the seizure of all his

13  computers, and was told by law enforcement that the search warrant was for child pornography, none of

14  that deterred him from continuing to engage in seeking out child pornography on the internet.  Koff left

15  the apartment in which he had resided for a number of years without any notice or forwarding

16  information.  He moved to Carson City, Nevada and made himself difficult to find.  The public records

17  on file for Koff led to post office boxes and not to any fixed address.  It was only through the fortuity of

18  a local police officer spotting the license plate registered to Koff on a vehicle near an apartment building

19  that Koff was finally located on May 22, 2014.

20      When located living alone in an apartment in Carson City, agents found Koff to be in possession

21  of a laptop computer, which he most likely acquired after the search warrant execution in San Francisco.

22  *See*, Exhibit 2, Report Number 003, Department of Homeland Security Report of Arrest and Search on

23  May 22, 2014.  The Digital Forensic Agent who conducted an initial on-site forensic review of the

24  laptop found items that could constitute child pornography and search terms that were indicative of

25  search for child pornography.  *Id.* at p.4.  When questioned, Koff could provide no logical reason why

26  he registered his vehicle to an address in Elko, Nevada or for his driver's license showing an address in

27  Stateline, Nevada.  *Id.*

28

1   According to the report prepared by the Forensic Agent of her review of the laptop, which is

2 included in Government's Exhibit 2, she found that the user of the computer had accessed Dropbox.com

3 to view a child pornography video of the victim known as Vicky on May 21, 2014, the day before agents

4 arrested Koff. *See*, Exh. 2, Examination of Laptop Computer, page 1. Dropbox is a free file sharing

5 program through which the user can create an account and then access material on the internet; the

6 material can be accessed and viewed, and it can also be downloaded. In the instant case, it appears that

7 Koff did not download the Vicky video, but he accessed it twice as indicated in the forensic report

8 where it recounts two visits to the video. *Id*. The Forensic Agent noted that the user also accessed

9 bitsnoop.com several times. She noted that this torrent website is known to be used to download child

10 pornography. *Id*.

11   The Forensic Agent examined the internet history and found use of websites and search engines

12 relating to anonymization and use of file sharing. *See*, Exh. 2, Forensic Report, at 1. She also located

13 visits to child pornography termed sites and bookmarked items during review of the internet artifacts.

14 *Id*. At the top of page two of her report, the Agent listed a number of search entries that are

15 unambiguously connected to child pornography. *Id*. at 2. The dates of access range from February 14,

16 2014 through May 8, 2014. *Id*. The agent provided a long list of additional search terms recovered that

17 relate to child pornography. *Id*. The agent was also able to recover seventeen images that depicted child

18 pornography and two child pornography movie files from deleted space on the computer. *Id*. at 3. As is

19 common knowledge among most computer users, a user can use the command "delete" for certain files,

20 but that does not necessarily eliminate all record of the existence of that item on the computer. Thus,

21 child pornography images and movies that Koff attempted to delete still resided on the computer and

22 were recovered.

23   The reasonable conclusion drawn from this evidence is that during the period between the search

24 on October 9, 2013, and Koff's arrest on May 22, 2014, Koff did not stop finding and looking at child

25 pornography on the internet; he just became more cautious about preserving any records of his activities.

26 While there was no active peer-to-peer software present on the computer, Koff was nevertheless

27 searching for child pornography, downloading it, and then deleting it. One such activity took place only

28 one day before agents arrested him. The Forensic Agent's report shows that Koff conducted searches

for information about preserving anonymity when using the internet. *Id.* at 3-4. Koff conducted such a search on Google as early as November 10, 2013, only a month after the search. *Id.* at 3. The "SparkTrust PC Cleaner," which agents advise is a tool for totally removing items from a computer, was installed on March 3, 2014.

Koff may attempt to argue that the evidence on his laptop constitutes evidence of his efforts to curb his addiction to child pornography. That is highly doubtful. Koff has downloaded and possessed child pornography for many years and describes himself as addicted to child pornography. Given the nature of addictions and the long-standing nature of Koff's activities in connection with child pornography, it is far more likely that what was found on the computer was evidence of Koff continuing to engage in those activities, and just being more careful not to preserve evidence in case he was caught. The evidence on the laptop was hardly mitigating; it shows the power this addiction holds over Koff and highlights the need to protect the victims of child pornography from further offenses by this defendant.

Other aspects of Koff's life and situation indicate that this was a life out of balance, with little social contact or socially productive use of time and energy. The way he was living indicates how deep-seated Koff's addiction and depression must be, and do not provide a basis to believe that it will be easy for Koff will conform his conduct to legal norms. According to the Presentence Report and a report by Douglas Korpi, Ph.D. that Koff's counsel provided to the Probation Officer and the government, Koff has not held a formal job or supported himself since 1996. He has been supporting himself on savings, the generosity of family and friends, and unemployment insurance. Dr. Korpi's report also describes a man who is articulate, alert, coherent, and self-aware. According to other materials submitted by defense counsel, Koff has been receiving psychiatric treatment, primarily for depression, from a doctor in Berkeley since 2001. Despite that, there is no indication that Koff sought help for his child pornography addiction.

When all of this information about Koff and the nature and circumstances of the offense conduct is viewed as a whole, it is apparent that the serious offenses in which Koff has been engaged are long-standing and are deeply rooted. While he recognizes the addictive nature of his actions, there is no evidence that he has sought assistance or treatment for his addiction, even though it exposed him to criminal liability. In fact, even when the computers containing his collections were seized, he did not

1    stop his illegal conduct, he just became more shrewd about it.  In short, there is no track record on which

2    the Court can base optimism that Koff will change.  The facts here support a substantial sentence that

3    will fairly and accurately reflect the long-standing nature and seriousness of his offenses, acknowledge

4    Koff's continuation of the offense conduct even in the face of law enforcement action, the need to

5    promote respect for the law, and the need to prevent Koff from continuing to commit the same harm.[5]

### 3.    Supervised Release

7    The government concurs with the recommendations by the Probation Officer regarding terms

8    and conditions of supervised release.  The government is aware that the recommended conditions are

9    those that the Probation Office in this district has been developing with careful consideration of the

10   special concerns regarding child pornography offenders.  The conditions recognize and address the

11   difficulties of monitoring computer and internet use by such offenders in a time when computers and the

12   internet are an integral part of people's lives.  The conditions balance those realities with the critical

13   concerns of ensuring that those on supervised release comply with requirements that they not commit

14   any new crimes, and in particular, not view child pornography.  The conditions are carefully crafted to

15   place reasonable restrictions on the defendant so as to provide a means by which the Court can monitor

16   the defendant's compliance with the Court's orders and promote recovery from addiction.

### 4.    Restitution

18   In connection with the instant case, the government received restitution claims from six victims

19   depicted in the files possessed by Koff.  These are the victims known as Angela, Vicky, Sarah, L.S.,

20   Cindy, and John Doe IV.  The materials submitted by counsel representing each of these victims is

21   included as Exhibits 3 through 7, and 16, respectively, in the United States' Exhibits in Support of

22   Sentencing Memorandum, filed separately under seal.  Based on these submissions, and as discussed

23   below, the government asks that the Court order Koff to pay restitution to each of these six victims.

24   Specifically, the government requests that the Court order Koff to pay restitution as follows:  $1,500

---

26   [5] Dr. Korpi's report of his evaluation of Koff is inconclusive at best.  Dr. Korpi identifies a
number of factors that suggest that Koff will re-offend, and some that point in the other direction.  The
government accepts Dr. Korpi's assessment that Koff does not show indications of committing a
27   "hands-on" offense in the future.  However, it is impossible to predict what this individual is going to do
in terms of re-offending by possessing child pornography and Dr. Korpi cannot provide any assurance to
28   this Court that Koff will not re-offend.

1  each to the victims known as Angela, Vicky, L.S., and Cindy, and $1,000 each to the victims known as

2  Sarah and John Doe IV.

3       ***a. Statutory Framework***

4       Section 2259 of Title 18 provides for mandatory restitution in child pornography cases.  18

5  U.S.C. § 2259(a).  It specifies that "[t]he order of restitution under this section shall direct the defendant

6  to pay the victim … the full amount of the victim's losses as determined by the court pursuant to

7  paragraph (2)."  18 U.S.C. § 2259(b)(1).  These losses include "medical services," "lost income,"

8  "attorney's fees," "other costs incurred," and any other losses suffered by the victim as a proximate

9  result of the offense.  18 U.S.C. § 2259(b)(3).

10       ***b. Caselaw***

11       "The primary goal of restitution is remedial or compensatory."  *United States v. Paroline*, ___

12  U.S. __, 134 S.Ct. 1710, 1726 (2014).  In *Paroline*, the Court addressed the issue of restitution for the

13  same offense of which Koff now stands convicted.  Beyond the goals set out above, the Court stated that

14  restitution also serves another important function – "impress[ing] upon offenders that their conduct

15  produces concrete and devastating harms for real, identifiable victims."  *Id*. at 1727.  The Supreme Court

16  held that in child pornography cases, sentencing courts should order restitution "to the extent the

17  defendant's offense proximately caused a victim's losses."  *Id*. at 1722.

18       As noted in the discussion above about the *Paroline* decision, the petitioner pled guilty to

19  possessing child pornography; among his collection were two sexually explicit images of a victim

20  known as "Amy."  *Paroline*, at 1716.   The Court recognized that the victim suffered harm distinct from

21  the harm from the original abuse due to the continued circulation of the images of her abuse.  *Id*. at

22  1717.

23       The victim in *Paroline* sought restitution from the defendant for lost income, future treatment,

24  attorney's fees and costs, and conceded that her losses did not flow from defendant's specific conduct.

25  *Paroline*, at 1717.  In analyzing this request, the Court started by holding that "a proximate-cause

26  requirement applies to all the losses described in § 2259."  *Id*. at 1722.  The government must show that

27  the defendant "was part of the overall phenomenon that caused [the victim's] general losses."  *Id*. at

28  1726.  This is true even if the victim is unaware of a particular defendant's conduct.  *See, id*. at 1723.

UNITED STATES' SENTENCING MEMORANDUM
CR 14-0270 EMC         18

The Court explained:  "The cause of the victim's general losses is the trade of her images.  And [the defendant] is a part of that cause, for he is one of those who viewed her images."  *Id*.  "While it is not possible to identify a discrete, readily definable incremental loss [a specific defendant] caused, it is indisputable that he was part of the overall phenomenon that caused her general losses."  *Id*.  The Court held that "the victim's costs of treatment and lost income resulting from the trauma of knowing that images of her abuse were being viewed over and over are direct and foreseeable results of child-pornography crimes."  *Id*. at 1722.

Second, the Court held that restitution is mandatory when the victim establishes losses caused by the trafficking of the victim's images:

> "Where it can be shown both that a defendant possessed a victim's images
> and that the victim has outstanding losses caused by the continuing traffic in
> those images but where it is impossible to trace a particular amount of those losses
> to the individual defendant by recourse to a more traditional causal inquiry,
> a court applying § 2259 should order restitution in an amount that comports with the
> defendant's relative role in the causal process that underlies the victim's general losses."

*Id*. at 1727.

The Court was adamant that the statute requires restitution in these cases, even when the loss attributable to a single defendant cannot be established concretely:

> "Denying restitution in cases like this would also be at odds with the penological
> purposes of § 2259's mandatory restitution scheme.  In a sense, every viewing of
> child pornography is a repetition of the victim's abuse.  **One reason to make
> restitution mandatory for crimes like this is to impress upon offenders that their
> conduct produces concrete and devastating harms for real, identifiable victims…
> It would be inconsistent with this purpose to apply the statute in a way that leaves
> offenders with the mistaken impression that child-pornography possession (at least
> where the images are in wide circulation) is a victimless crime."**

*Id*. at 1727 (emphasis added).

As for the causal connection between the offense and injury, there is no need to prove loss or causation in regards to any particular offender – it is the harm inflicted by the aggregated conduct of offenders that is particularly relevant.  *Paroline*, at 1726-27.  To the extent a defendant engaged in certain aggravating conduct, that can be considered, but there is no requirement to provide particularized conduct leading to particularized harm.  *Id*.  All that matters is that a victim's loss was generally

1  attributed to the trafficking in and viewing of the victim's images.  The materials submitted by the

2  victims and filed separately easily exceed that burden of proof.

3          The Court held that the size of any defendant's portion of restitution should be determined by the

4  district court, in its exercise of discretion.  *Paroline*, at 1728.  The Court emphasized that there is no

5  "precise mathematical inquiry" governing this determination and that district courts will have to exercise

6  "discretion and sound judgment" in fashioning awards.  *Id*.  The Court said that the sentencing court

7  "must assess as best it can from available evidence the significance of the individual defendant's

8  conduct in light of the broader causal process that produced the victim's losses."  *Id*. 1727-28.  The

9  amount assessed to each defendant should be neither "severe" nor "token or nominal."  *Id*.  1727.

10         The *Paroline* Court held that district courts may start their calculations by determining "the

11  amount of the victim's losses caused by the continuing traffic in the victim's images (excluding, of

12  course, any remote losses …)."  *Paroline*, at 1728.  In determining the share of those losses for which a

13  particular defendant should be held liable, courts may then consider a variety of factors which "could

14  include":

15         • The number of past criminal defendants found to have contributed to the victim's general

16           losses;

17         • Reasonable predictions of the number of future offenders likely to be caught and

18           convicted for crimes contributing to the victim's general losses;

19         • Any available and reasonably reliable estimate of the broader number of offenders

20           involved (most of whom will, of course, never be caught or convicted);

21         • Whether the defendant reproduced or distributed images of the victim;

22         • Whether the defendant had any connection to the initial production of the images;

23         • How many images of the victim the defendant possessed; and

24         • Any other facts relevant to the defendant's relative causal role.

25  *Id*.  The Court held that these factors should "serve as rough guideposts for determining an amount that

26  fits the offense."  *Id*.

27         The Supreme Court recognized that "[t]his approach is not without its difficulties."  *Paroline*, at

28  1729.  "[C]ourts can only do their best to apply the statute as written in a workable manner, faithful to

1   the competing principles at stake:  that victims should be compensated and that defendants should be

2   held to account for the impact of their conduct on those victims, but also that defendants should be made

3   liable for the consequences and gravity of their own conduct, not the conduct of others."  *Id.*

4       ### c.  Restitution to Angela, Vicky, Sarah, L.S., Cindy, and John Doe IV is Mandatory

5           #### 1.  Causation

6       Counsel on behalf of the individuals known as Angela, Vicky, Sarah, L.S., Cindy, and John Doe

7   IV have submitted claims for restitution.  *See*, Exhs. 3-7, 16.  Each of these victims has established that

8   Koff, as a possessor of at least one image of the individual's sexual abuse as a child, is a proximate

9   cause of harm suffered by the victim.  Through counsel, each victim has provided sufficient information

10  to meet the proximate cause requirement set out in *Paroline*.  That is, counsel has provided information

11  through the words of the victim, the victim's family, treating psychologists and other professionals to

12  establish that Koff's obtaining of images of the victim through the internet and possessing those images

13  were "part of the overall phenomenon that caused [the victim's] losses."  *Paroline*, at 1723.  In addition,

14  each victim has provided information regarding financial expenses incurred and expected.   Thus, the

15  government has met its burden of showing that for each victim, Koff possessed the victim's image and

16  each victim has established "outstanding losses caused by the continuing traffic in those images."

17  *Paroline*, at 1727.

18      For example, Dr. Randall Green's 2014 Addendum to Status Report Update for Vicky describes

19  in depth the continuing impact of the victim knowing that images of her abuse continue to be viewed

20  and traded and summarizes:

21      "All of the above vectors related to the downloading, distribution, and consumption of the
        images of her abuse frighten her, and trigger anxiety, dissociative responses, social

22      withdrawal, anger, and violation.  They also generate symptoms of powerlessness, fears of
        being alone, violation, nightmares, reactivated thoughts and feelings of her original abuse,

23      avoidance, hypervigilance, sleep disruption, and needs for greater control.  … In my
        professional opinion, the initial evaluation and four updates, covering approximately

24      4-1/2 years, support the conclusion, based on a reasonable degree of psychological
        probability, that Ms. Doe has suffered, is suffering, and will continue to suffer

25      psychological injury that is related to the collective contribution of each individual
        downloader, whether she has specific knowledge of any particular one, or not."

26

27  Addendum to Status Update Report, April 23, 2014, by Randall L. Green, Ph.D., Clinical Psychologist,

28

Exhibit 4, Item 3, pp. 19-20.  The submission by counsel for Vicky includes the evaluation by Dr. Green, vocational assessments, a forensic analysis of lost wages, and a declaration by counsel in support of attorney's fees and costs.

Similarly, Dr. Cooper, a forensic pediatrician who examined and evaluated L.S. writes that

> "this minor victim is very clear in her feelings that there is no doubt that she was profoundly negatively affected by the sexually sadistic abuse that she endured for several years in her preschool and elementary school years.  However, she is also adamant that the downloading, trading and possession of images of her victimization that continues to the present, is in fact causing her to experience further injury and ongoing extreme angst.  She expresses disgust in knowing that people are looking at her images with enjoyment and she states that this knowledge continues to prevent her from healing because her privacy is being repeatedly invaded…This victim remains aware of the presence of the images online and experiences anxiety, depression, anger and justifiable paranoia regarding others accessing the images and viewing what she defines as the most terrible and terrifying moments of her life."

Report of Sharon M. Cooper, M.D., dated July 1, 2010, attached to Victim Impact Statement, Exhibit 6, at pp. 12-14.  Dr. Cooper concludes:  "Based on my evaluation of this child, at least 50% of her physical, emotional and psychological damages as I have outlined in this case are directly due to the fact that others continue to download, trade and possess images of her abuse."  *Id*. at p. 13.  Accompanying her report, Dr. Cooper provides "Medical Health Care Cost Estimates" for L.S. and counsel provides information about attorney's fees and other costs.  *See*, Exh. 6, Cooper Report and Letter from John Ratcliffe, Esq.

Counsel for Angela, Sarah, Cindy, and John Doe IV have submitted similar materials quantifying harm and in support of claims for restitution and those documents are contained in the Government's Exhibits at Exhibits 3, 5, 7, and 16, respectively.

### 2.  Apportionment

Each victim has requested that Koff pay a larger amount of restitution than what the government recommends here.  The government's requests for restitution apportioned to Koff are based on the victim's submissions as well as the government's analysis of the *Paroline* factors.

#### (i)  *Angela*

The restitution request submitted by Angela's attorney is $12,100 to $16,520, as apportioned to Koff.  *See*, Exh. 3, Letter of Marc C. Lenahan, at p. 1.  To apportion losses to Koff, the government has

1  considered the information submitted on behalf of Angela and the analysis suggested in *Paroline*.  The

2  government requests that the Court enter a restitution order for Angela in the amount of $1,500.

3      a.   <u>Past Criminal Defendants Who Have Contributed</u> – The government has endeavored to

4  provide the Court with helpful information on this factor, and has two sources of information.  First, the

5  government asked Angela's counsel to provide relevant data.  Counsel reports that as of February 26,

6  2015, a total of 77 defendants have been ordered to pay restitution to Angela.  The current amount due is

7  $240,384.  The total amount paid is $20,456.  Second, the Child Exploitation and Obscenity Section

8  ("CEOS") of the U.S. Department of Justice has started to compile information provided by federal

9  prosecutors pertaining to restitution ordered by sentencing courts for specific victims.  The data sheds

10  additional light on restitution payments, at least for federal defendants.  The current data collected by

11  CEOS for restitution orders for Angela is provided in the chart attached to this Memorandum as Exhibit

12  1(A).  The chart shows that for *reported cases,* sentencing courts have ordered restitution paid to the

13  victim known as Angela in 56 federal cases with amounts varying from $500 to $29,859.  *See*, Exh.

14  1(A).  The chart does not provide any information on whether any of these defendants have started

15  paying restitution to Angela or whether they are (or will be) in a financial position to pay at all.  Further,

16  the government notes that the information in the chart relies on data reported only be federal

17  prosecutors, and there is no mandatory reporting obligation of this information.

18      b.   <u>Reasonable Predictions of Future Offenders Likely to be Caught / Convicted</u> – This factor is

19  impossible to estimate with any degree of certainty.

20      c.   <u>Reasonable Estimate of the Broader Number of Offenders Involved</u> – The National Center

21  for Missing and Exploited Children (NCMEC) has provided the government information that establishes

22  that NCMEC analysts have located 2,097 reports indicating that the Angela series was identified on

23  media submitted for review by a law enforcement agency.  Analysts have viewed over 13,700 files that

24  appear to be associated with the Angela series.  *See*, Exh. 17 (Affidavit of John Sheehan, Vice President,

25  Exploited Children Division, NCMEC).  This does not necessarily correlate to 2,097 individual

26  possessors of Angela's images because certain defendants, such as Koff, may have multiple devices on

27  which they store child pornography.  Further, not all instances in which NCMEC located Angela's

28  *///*

1   images result in prosecution, much less a restitution request or award.  Nevertheless, NCMEC's

2   information provides an indication of how widespread Angela's images are now.

3         d.   Whether Koff Reproduced or Distributed Images – The government cannot establish that

4   Koff reproduced or distributed images of the victim known as Angela.

5         e.   How Many Images of the Victim Koff Possessed – The defendant possessed 12 images of

6   Angela.

7         Consideration of the factors suggested by the Court in *Paroline* demonstrates how difficult it is

8   to arrive at a figure that is an appropriate amount of restitution that Koff should pay toward the victim

9   known as Angela.  The *Paroline* Court's discussion of the harm that is suffered by victims of the crime

10  that Koff committed, combined with the very real impacts described by Dr. Alexandria Doyle and

11  Angela's mother [*see*, Exh. 3], make it clear that Koff should be held accountable for some amount of

12  restitution to this victim that is neither "severe" nor "nominal."  In light of all information available, the

13  government submits that a restitution award to Angela of $1,500 is reasonable and appropriate.  This

14  amount, though not huge, will contribute to assisting the victim in paying the costs of therapy and will

15  contribute to holding Koff accountable for the financial harm caused by his offense.  As the *Paroline*

16  Court stated, the purposes of restitution are not only to compensate, but to "impress upon offenders that

17  their conduct produces concrete and devastating harms for real, identifiable victims."  *Id.* at 1727.  The

18  circumstances of this case squarely fit within those that the Court described as requiring an order of

19  restitution under 18 U.S.C. § 2259(b)(1).

20         *(ii)*   **Vicky**

21         Counsel for the victim known as Vicky has submitted a request that the Court order Koff to pay

22  $27,500 in restitution to Vicky.  *See*, Exh. 4, Letter of Carol L. Hepburn, at p. 2.  Pursuant to its analysis

23  of  information submitted by Vicky's counsel and the *Paroline* factors, the government requests that the

24  Court require Koff to pay $1,5000 in restitution to Vicky.

25         a.   Past Criminal Defendants Who Have Contributed – Counsel for Vicky informs the

26  government that she has been making restitution requests for Vicky for five years.  Counsel reports

27  records of 615 restitution orders of which, in 444 cases, defendants have started making payments.

28  Some payments are as low as $6.25.  The total gross received is $1,033,656.  Of this, $344,552 has gone

to attorney's fees, and $90,638 has gone to out-of-pocket expenses, leaving $598,466 having been paid to Vicky.

The CEOS record for the victim known as Vicky, attached as Exh. 1(B), shows that federal courts have ordered 530 defendants to pay restitution in amounts ranging from $500 to $1,330,015.

b.   <u>Reasonable Predictions of Future Offenders Likely to be Caught / Convicted</u> – This factor is impossible to estimate with any degree of certainty.

c.   <u>Reasonable Estimate of the Broader Number of Offenders Involved</u> -- The information provided by NCMEC states that analysts have located 14,259 reports indicating that the Vicky series was identified on media submitted for review by a law enforcement agency.  Analysts have viewed over 197,900 files that appear to be associated with the Vicky series.  *See*, Exh. 17.

d.   <u>Whether Koff Reproduced or Distributed Images</u> – The government cannot establish that Koff reproduced or distributed images of the victim known as Vicky.

e.   <u>How Many Images Koff Possessed</u> – Koff possessed 11 images and 20 videos of Vicky.

The government submits that in light of all information available, a restitution award of $1,500 to the victim known as Vicky in this case is appropriate, and neither too severe, nor nominal.

### (iii)   *Sarah*

Counsel for the victim known as Sarah (the Marineland series) has requested that the Court order Koff to pay $25,000 in restitution.  *See*, Exh. 5, Letter of Carol L. Hepburn, at p. 2.  After considering the materials submitted on behalf of Sarah by counsel and the Paroline factors, the government requests that the Court order Koff to pay $1,000 in restitution to Sarah.

a.   <u>Past Criminal Defendants Who Have Contributed</u> – Counsel for Sarah informs the government that there are now 30 orders of restitution for Sarah and that 4 defendants have made payments thus far, with gross receipts of $15,562.  Of this, Sarah has received $5,187 and the remainder has gone to fees and out-of-pocket expenses.

The CEOS record for Sarah shows that for the cases reported, federal courts only started ordering restitution to Sarah in 2014.  To date, eight such orders have been entered, with amounts ranging from $500 to $27,319.  *See*, Exh. 1(C).

///

UNITED STATES' SENTENCING MEMORANDUM
CR 14-0270 EMC                                    25

b. <u>Reasonable Predictions of Future Offenders Likely to be Caught / Convicted</u> – This factor is impossible to estimate with any degree of certainty.

c. <u>Reasonable Estimate of the Broader Number of Offenders Involved</u> – The government did not receive any information from NCMEC regarding this specific victim in the Marineland series.

d. <u>Whether Koff Reproduced or Distributed Images</u> – The government cannot establish that Koff reproduced or distributed images of the victim known as Sarah.

e. <u>How Many Images Koff Possessed</u> – Koff possessed one video depicting Sarah. In this instance, the limited information available suggests that the images of Sarah are not widespread, thereby indicating that Koff's portion of responsibility for the harm should be greater. However, Koff possessed a single video of Sarah. In light of all available information, the government submits that a restitution order of $1,000 is appropriate.

**(iv)   L.S.**

Counsel for the victim known as L.S. has submitted a request that the Court order Koff to pay no less than $150,000 in restitution to L.S. The government requests that the Court impose a restitution order of $1,500.

a. <u>Past Criminal Defendants Who Have Contributed</u> – Counsel for L.S. informs the government that she is aware of 199 restitution orders. Of those, 132 defendants have started making payments. To date, $453,668 has been paid, with $233,702 going to the victim. An additional $18,516 has been received, but has not yet been disbursed.

The CEOS record for the victim known as L.S., attached as Exh. 1(D), shows that federal courts have ordered 157 defendants to pay restitution in amounts ranging from $500 to $150,000.

b. <u>Reasonable Predictions of Future Offenders Likely to be Caught / Convicted</u> – This factor is impossible to estimate with any degree of certainty.

c. <u>Reasonable Estimate of the Broader Number of Offenders Involved</u> – NCMEC was not able to provide information about this particular victim in the Jan_Feb series.

d. <u>Whether Koff Reproduced or Distributed Images</u> – The government cannot establish that Koff reproduced or distributed images of the victim known as L.S.

e. <u>How Many Images Koff Possessed</u> – Koff possessed 6 images of the victim known as L.S.

In light of information submitted by L.S.'s counsel and analysis of the Paroline factors, the government requests that the Court order Koff to pay $1,500 restitution to L.S. Again, this amount is neither severe, nor nominal, and is reasonable under the circumstances.

### (v)    Cindy

Counsel for the victim known as Cindy has submitted a request asking that the Court order Koff to pay no less than $8,000 to Cindy (out of a total estimated economic loss of over $1.3 million). *See*, Exh. 7, Letter from Thomas M. Watson, at 1, at 8. The government requests that the Court enter a restitution order of $1,500. The government submits the following information pertaining to the *Paroline* factors as to Cindy.

a.    <u>Past Criminal Defendants Who Have Contributed</u> – Counsel for Cindy has advised that 216 people have been ordered to pay restitution. He further advises that 136 defendants have balances due on restitution and 42 have started to make payments on those balances. He assumes the other 80 have paid in full. Counsel advises that $227,242 has been collected and $137,227 has gone to Cindy's Special Needs Trust. About $20,000 was spent on having Cindy evaluated by experts, setting up the trust, etc. He advises that most of his attorney's fees go to pay staff to keep up with the massive amount of paperwork involved in keeping track of hundreds of defendants' cases and the bookkeeping necessary to track all the payments / partial payments by defendants.

The CEOS record for the victim known as Cindy, attached as Exh. 1(E), shows that federal courts have ordered 151 defendants to pay restitution in amounts ranging from $500 to $110,971.

b.    <u>Reasonable Predictions of Future Offenders Likely to be Caught / Convicted</u> – This factor is impossible to estimate with any degree of certainty.

c.    <u>Reasonable Estimate of the Broader Number of Offenders Involved</u> -- The information provided by NCMEC states that analysts have located 6,093 reports indicating that the Cindy series was identified on media submitted for review by a law enforcement agency. Analysts have viewed over 60,000 files that appear to be associated with the Cindy series. *See*, Exh. 17.

d.    <u>Whether Koff Reproduced or Distributed Images</u> – The government cannot establish that Koff reproduced or distributed images of the victim known as Cindy.

///

1    e.   How Many Images Koff Possessed – Koff possessed 7 images of the victim known as

2  Cindy.

3    In light of the information provided by Cindy's counsel and analysis of the *Paroline* factors, the

4  government is seeking a restitution order for Cindy in the amount of $1,500.

5    *(vi)   John Doe IV*

6    The victim known as "John Doe IV" is one of five victims of child pornography depicted in

7  images known as the "8 Kids Series."  The victim impact statement and restitution materials submitted

8  by counsel for John Doe IV are contained in Exhibit 16.  Counsel has requested that the Court order

9  Koff to pay $25,000 in restitution to John Doe IV.  *See*, Exh. 16, Letter of Tanya Hankins, at p. 1.

10  Taking into account the information provided on behalf of John Doe IV and the *Paroline* factors, the

11  government requests that the Court order Koff to pay John Doe IV $1,000 in restitution.

12    a.   Past Criminal Defendants Who Have Contributed – Counsel for John Doe IV has advised

13  that 103 defendants have been ordered to pay restitution to at least one of her clients, John Does I

14  through IV.  Of those, 42 have paid or have begun making payments.  Excluding attorney's fees and

15  costs, to date John Doe IV, who is also known as "ED," has received approximately $30,000.

16    CEOS maintains a single record for the collective victims in the 8 Kids series.  A copy is

17  attached at Exhibit 1(F).  John Doe IV is designated therein by the initial "E."  The CEOS record shows

18  that federal courts have ordered at least 33 defendants to pay restitution to John Doe IV in amounts

19  ranging from $100 to $25,000.

20    b.   Reasonable Predictions of Future Offenders Likely to be Caught / Convicted – This

21  factor is impossible to estimate with any degree of certainty.

22    c.   Reasonable Estimate of the Broader Number of Offenders Involved – NCMEC was not

23  able to provide information about this particular victim in the 8 Kids series.

24    d.   Whether Koff Reproduced or Distributed Images – The government cannot establish that

25  Koff reproduced or distributed images of the victim known as John Doe IV.

26    e.   How Many Images Koff Possessed – Koff possessed 1 image of the victim known as John

27  Doe IV.

28    In light of the *Paroline* factors and all the information in the record, including the fact that Koff

1   possessed a single image of John Doe IV, the requests that the Court order Koff to pay $1,000 restitution

2   to John Doe IV.

3                                                    **CONCLUSION**

4          For the reasons discussed above, the government respectfully requests that the Court impose a

5   sentence of 78 months imprisonment, followed by a five-year term of supervised release, restitution,

6   forfeiture, and a $100 special assessment.  The government also respectfully requests that the Court

7   order Koff to make restitution as follows:

8   •   $1,500 to the victim known as Angela.  Payment to be made to the Lenahan Law Firm, One

9        Metro Square – West, 2655 Villa Creek, Suite 204, Dallas, Texas 75234, attention:  Marc

10       Lenahan.

11  •   $1,500 to the victim known as Vicky.  Payment to be made to Carol L. Hepburn, Attorney at

12       Law, 2722 Eastlake Avenue E, Suite 200, Seattle, Washington 98102.

13  •   $1,000 to the victim known as Sarah.  Payment to be made to Carol L. Hepburn, Attorney at

14       Law, 2722 Eastlake Avenue E, Suite 200, Seattle, Washington 98102.

15  •   $1,500 to the victim known as L.S.  Payment to be made to Ashcroft, Sutton, Radcliffe, 1700

16       Pacific, Suite 3600, Dallas, Texas 75201, attention:  John Ratcliffe.

17  •   $1,500 to the victim known as Cindy.  Payment to be made to Cusack, Gilfillan & O'Day, LLC,

18       415 Hamilton Boulevard, Peoria, Illinois 61602, attention:  Thomas M. Watson.

19  •   $1,000 to the victim known as John Doe IV.  Payment to be made to the Law Offices of Erik L.

20       Bauer, 215 Tacoma Avenue South, Tacoma, Washington 98402, attention:  Tanya Hankins.

21

22  DATED: May 13, 2015                          Respectfully submitted,

23
                                                 MELINDA HAAG
24                                               United States Attorney

25                                               _____/s/_____
                                                 SUSAN E. BADGER
26                                               Assistant United States Attorney

27

28

UNITED STATES' SENTENCING MEMORANDUM
CR 14-0270 EMC                    29